UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SANDRA E. McDOWELL,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )      No. 4:04 CV 1311 DJS
                                   )                      DDN
JO ANNE B. BARNHART,               )
Commissioner of                    )
Social Security,                   )
                                   )
            Defendant.             )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Sandra E. McDowell for supplemental security
income (SSI) benefits under Title XVI of the Social Security Act (the
Act), 42 U.S.C. §§ 1381, et seq.  The action was referred to the
undersigned United States Magistrate Judge for a recommended disposition
under 28 U.S.C. § 636(b).

**I.  BACKGROUND**

**A.   Plaintiff's Application and Medical Records**

In March 2002, plaintiff, who was born in 1962, applied for SSI
benefits alleging she became disabled on April 15, 2000.  Plaintiff
alleges the inability to engage in substantial, gainful employment due
to depression, headaches, hearing voices, anxiety attacks, and chronic
pain.  (Tr. 100-01, 139.)

Plaintiff's relevant work history includes her most recent work as
an inventory clerk for a drug store in April 2001.  In April 1995,
plaintiff worked as a grocery store cashier, and she worked as a book
store cashier from September 1994 through October 1994.  From March 1993
until April 1993, plaintiff worked as a hotel housekeeper, and from
October 1987 until October 1988, plaintiff worked as a certified nurse's
assistant in various nursing homes.  (Tr. 129-134.)

Plaintiff's salary history is as follows:

| | | | | |
|---|---|---|---|---|
| 1980 | 2,510.59 | 1992 | $ | 213.16 |
| 1981 | 1,906.72 | 1993 | | 112.50 |
| 1982 | 1,454.57 | 1994 | | 1,418.22 |
| 1983 | 241.98 | 1995 | | 519.57 |
| 1984 | 365.32 | 1996 | | .00 |
| 1985 | 2,369.67 | 1997 | | 288.00 |
| 1986 | 1,710.32 | 1998 | | 16.50 |
| 1987 | .00 | 1999 | | 164.50 |
| 1988 | 4,118.80 | 2000 | | 42.50 |
| 1989 | 1,609.29 | 2001 | | 15.75 |
| 1990 | 256.39 | 2002 | | .00 |
| 1991 | .00 | | | |

(Tr. 102-08.)

In an April 9, 2002, claimant questionnaire, plaintiff reports a history of uterine cancer and a hysterectomy in 1997. Plaintiff states that she experiences crying spells, major depression, headaches, hot flashes, nervousness, anxiety attacks, suicidal ideation, voices in her head encouraging her to kill herself, anxiety around other people, sharp pain in her back, and difficulty sleeping. To relieve these symptoms, plaintiff states that she "rocks herself," and she takes Premarin[1] and Paxil.[2] Plaintiff states that side effects from these medications include hot flashes, diarrhea, and constipation. (Tr. 139.)

Due to these impairments, plaintiff reports that she is unable to "work, think clearly, and have a good nights sleep." With respect to self-care, plaintiff reports she is "not as tidy as usual." Plaintiff lives with a friend and is not responsible for preparing meals, but states she has difficulty preparing meals because she is nervous and drops items. Plaintiff reports that she has difficulty with her memory and cannot follow directions well. With respect to household chores, plaintiff states that she makes her bed without assistance. She does

---

[1]Premarin is an "[e]strogen drug product[] . . . indicated in the: 1. Treatment of moderate to severe vasomotor symptoms associated with menopause." Physician's Desk Reference (PDR), 3429 (55th ed. 2001).

[2]"Paxil . . . is indicated for the treatment of depression." Id. at 3115.

-2-

not go shopping, stating that "[t]he person I live with does it." (Tr. 140.)

Regarding recreational activities, plaintiff says that she used to enjoy puzzles, but can no longer concentrate when working a puzzle. Plaintiff watches cartoons, church programs, and movies. She does not read due to difficulties with concentration. Plaintiff reports driving on occasion, "but when I'm nervous I don't drive." Plaintiff says she leaves her home approximately four to five times per month, often going to her daughter's house approximately 10-20 miles away or to the laundromat. When leaving her house, plaintiff reports sometimes feeling nervous around others and that "[t]hey just don't understand me and my problems so I stay away." (Tr. 141-42.)

Plaintiff also completed a pain questionnaire. Plaintiff reports she experiences constant headaches, severe back pain, chills, and tingling in her hands and arms. Plaintiff states this pain occurred after her hysterectomy in 1997 and happens quickly, with no known triggers. Her back pain prevents her from bending and reaching. To control the pain, plaintiff takes Tylenol,[3] but reports "[i]t is not effective enough," Flexeril,[4] and Percosits.[5] (Tr. 138.)

Also on April 9, 2002, plaintiff's friend Marlena Jones completed an interested third party activity questionnaire. Ms. Jones has known plaintiff for 15 years. She reports witnessing plaintiff experience severe headaches, crying spells, talking to herself and attempting suicide, as well as reports plaintiff told her she hears voices telling her to kill herself. Ms. Jones believes plaintiff "has not been the

---

[3]Tylenol (acetaminophen) is used "[f]or the temporary relief of minor aches and pains associated with headache, muscular aches, backache, minor arthritis pain, common cold, toothache, menstrual cramps and for the reduction of fever." Id. at 1832.

[4]"Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Id. at 1929.

[5]There is no medication listed in the PDR as Percosits. Phonetically, however, Percosits is similar to Percocet, which "is indicated for the relief of moderate to moderately severe pain." Id. at 1211.

same" since 1996.  Ms. Jones further reports that plaintiff avoids dealing with other people because they don't understand her condition. (Tr. 137.)

Plaintiff's relevant medical records begin with 122 pages of medical records from 1968 when plaintiff underwent treatment at the Homer G. Phillips, St. Louis City Hospital, for burns she suffered after playing with matches as a child.  Perhaps due to the age of these records, they are generally illegible.  However, they appear to support plaintiff's reports, and those of subsequent physicians, that plaintiff underwent multiple skin grafts due to this injury.  (Tr. 210-332.)

On November 30, 2000, plaintiff was seen at the St. Louis Comprehensive Health Center, Inc.  At this visit, plaintiff's neurological examination was essentially normal, with 5/5 strength in all muscle groups.  Plaintiff was diagnosed with muscle strain and prescribed Anaprox[6] and Flexeril.  On October 8, 2001, plaintiff was seen at Comprehensive and was given Premarin to continue her hormone replacement therapy.  On December 21, 2001, plaintiff underwent a gynecological examination.  The examination was essentially normal, and it was noted that plaintiff presented with "hysterectomy with severe vasomotor symptoms and depression secondary to her life situation."  Her Premarin dose was increased, and she was prescribed Paxil.  (Tr. 156-58.)

On April 2, 2002, plaintiff underwent a mental health evaluation at the Hopewell Center.  During the examination, plaintiff reported traumatic experiences from her childhood and feeling like she was abused and not of any worth.  Plaintiff further reported that she is depressed, suicidal, and hears voices that tell her to hurt herself.  However, plaintiff said that she wants to live for her daughter and granddaughters.  Plaintiff further admitted a history of marijuana use for 10-15 years, sometimes using marijuana two to three times per day to bring about a calming effect.  (Tr. 162-72.)

---

[6]Anaprox (Naprosyn) is "indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis and juvenile arthritis."  Id. at 2745.

-4-

Plaintiff presented as soft spoken, casually groomed, and was not agitated.  Plaintiff's thought processes were relevant and coherent.  She complained of crying for no reason and suicidal ideation.  Plaintiff denied any visual hallucinations.  Plaintiff described her mood as "sad" at times.  Her memory was assessed as "bad" when she was preoccupied about past experiences.  Plaintiff was oriented to time, person, and place.  (Tr. 171-74.)

Plaintiff was diagnosed as follows:

Axis I:  Bipolar I Disorder, Most Recent Episode Depressed, Severe with psychotic features

Axis II:  None

Axis III:  None

Axis IV:  93[7]

Axis V:  Global Assessment of Functioning (GAF)[8] 50[9]

(Tr. 162.)

On April 29, 2002, plaintiff underwent a psychiatric evaluation by Karen Cowan, M.D.  Upon examination, Dr. Cowan noted plaintiff was casually dressed and neatly groomed.  She exhibited only fair eye contact and became tearful during the interview.  Plaintiff had slow, monotone speech and overall slow motor movement.  Plaintiff's mood was depressed, with flat affect.  Plaintiff reported hearing voices telling her to kill herself, but she noted being able to resist those voices and had no such plan or intent.  Plaintiff further denied any paranoid delusions or visual hallucinations.  Dr. Cowan found plaintiff had good

_____

[7]The undersigned was not able to determine what this numerical notation corresponded to narratively.  An Axis IV diagnosis generally prescribes an individual's "psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders."  Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (Text Revision) (DSM-IV-TR), 31 (4th ed 2000).

[8]The GAF scale is used by clinicians to report an individual's overall level of functioning.  See id. at 32.

[9]"Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id. at 34.

insight and judgment.  Plaintiff was alert and orientated to time, person and place, and displayed fair concentration, intact memory and average intellect.  (Tr. 341-42.)

Dr. Cowan diagnosed plaintiff as follows:

Axis I:      1.   Major    affective disorder, depression, recurrent, severe with psychotic features.

2.   Need to consider somatization disorder.

3.   Tobacco dependence.

4.   History of cannabis abuse.

Axis II:    Deferred, dependent traits are noted.

Axis III:   1.   Hysterectomy.

2.   Back pain and headaches after two motor vehicle accidents.

3.   Third-degree burns in childhood with skin grafts to chest and thighs.

4.   History of hypercholesterolemia.

5.   History of ovarian cancer.

6.   History of iron-deficiency anemia.

Axis IV:    5/Severe.

Axis V:     40/40.[10]

(Tr. 342-43.)  Dr. Cowan prescribed a treatment plan to include increasing plaintiff's Paxil dosage, and adding Risperdal[11] for psychotic

_____

[10]"Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) of major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; . . . .)"   Id.

[11]Risperdal "is indicated for the management of the manifestations of psychotic disorders."  PDR at 1580.

symptoms.  Plaintiff was instructed to coordinate follow-up care and continue visiting her primary care physician.  (Tr. 343.)

Hopewell Center further completed a "Medication Profile" on April 29, 2002, listing plaintiff's medications as Premarin, Paxil, and Risperdal.  The profile further noted that plaintiff has a history of partial compliance with medication.  At this visit, plaintiff was given a prescription for two months of Paxil and Risperdal, with no additional refills.  (Tr. 341-49, 357.)

On May 15, 2002, plaintiff was examined, at SSA's request, by James D. Reid, Ph.D.  Upon examination, Dr. Reid noted plaintiff presented with normal hygiene and grooming.  She exhibited a despondent attitude, dull facial expression, as well as normal motor activity, posture, gait, mannerisms and eye contact.  Plaintiff was coherent, relevant and logical, but lacked spontaneity.  She was soft spoken with normal flow of speech.  She exhibited no tangents, flight of ideas, or perseveration.  (Tr. 176.)

Plaintiff reported depression since her father died 14 years ago, in addition to interpersonal difficulties with her family, particularly her mother.  Dr. Reid noted Hopewell diagnosed plaintiff with bipolar disorder.  However, he did not assess symptoms of mania.  Plaintiff reported preoccupation with harming herself, but denied any thought disturbances, perceptual distortions, or paranoid delusions.  Plaintiff admitted to hearing voices and believing the voice was that of the devil encouraging her to harm herself.  Plaintiff denied any suicidal plan or homicidal ideation.  (Tr. 177.)

Plaintiff appeared to live within a normal realm of reality and was orientated to person, time, and place.  Plaintiff was able to count backwards and recite the alphabet in a short time frame, as well as complete simple addition, but with errors in multiplication and subtraction.  Plaintiff exhibited normal short-term and long-term memory, with her cognitive development at the concrete operational stage.  Plaintiff appeared limited with respect to insight and social judgment.  She exhibited moderate impairment with concentration, persistence, and pace on examination.  (Tr. 177.)

Dr. Reid's overall impressions were that plaintiff presented with "major depressive disorder with psychotic features." His DSM IV diagnosis includes:

Axis I:    Major depression with psychotic features. Cannabis abuse.

Axis II:   No diagnosis or condition.

Axis III:  Headaches; history of cancer and hysterectomy; mental and back pain by self-report.

Axis IV:   Psychosocial and environmental problems: problems with primary support group; problems related to the social environment; and economic problems.

Axis V:    GAF=60.[12]

(Tr. 178.)

Dr. Reid noted that plaintiff alleges she cannot work due to pain, cancer, hearing voices, depression, and headaches. He found plaintiff's motivation was fair and her prognosis was fair with appropriate treatment. Dr. Reid recommended that plaintiff continue psychiatric care in conjunction with taking prescription medication, and he suggested plaintiff could benefit from psychotherapy. He further found her ability to relate to others, including co-workers and supervisors, was moderately impaired, as was her ability to interact socially, and understand, remember and follow instructions. Plaintiff was significantly impaired in her ability to maintain attention required to perform simple, repetitive tasks, withstand the stress associated with daily work, and adapt to new situations and cope with the stressors of modern life. Plaintiff also may be a risk in managing supplemental funds. (Tr. 178-79.)

In addition to the examination, Dr. Reid reviewed plaintiff's claimant questionnaire, pain questionnaire, daily activities questionnaire, progress notes from Hopewell Clinic, records from

_____

[12]"Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.

Comprehensive, and records from Grace Hill Neighborhood Clinic.  (Tr. 175.)

Also on May 15, 2002, plaintiff underwent an internal medicine evaluation by Llewellyn Sale, Jr., M.D.  Dr. Sale noted plaintiff had a history of back pain, cancer of the uterus, hysterectomy, hearing voices, depression, severe headaches, burns received at five years of age, peptic ulcer disease, 20 years of smoking up  to two packs per day, and marijuana two times per week.  (Tr. 180-81.)

Physical examination revealed plaintiff exhibited normal speech and hearing, and normal head, ears, eyes, nose and throat.  Plaintiff's neck, lungs, abdomen, and heart were normal.  Dr. Sale noted plaintiff had extensive burns and signs of vitiligo.[13]  Examination of the back revealed tenderness in the lumbar area and sacroiliac joints, with slight paraspinal lumbar muscle spasm.  Plaintiff had a slight decrease in motion of the lumbar spine with minimal paravertebral lumbar muscle spasm.  Plaintiff exhibited normal gait, the ability to squat and heel walk, and fine finger control, but had difficulty walking on her toes.  Neurological examination revealed 5/5 muscle strength in the upper and lower extremities and 4/5 hand grip strength.  The neurological examination was otherwise normal, as was plaintiff's range of motion in the shoulder, elbow, wrist, hip, cervical spine, and lumbar spine.  (Tr. 181-82, 184-85.)

Dr. Sale found plaintiff exhibited the following on examination:

1.  Low back pain, probably from a chronic strain or sprain.

2.  History of ovarian cancer with hysterectomy.

3.  Psychiatric problems to be further evaluated.

4.  Daily headaches for 10 years, likely due to tension.

(Tr. 182.)

On May 28, 2002, consultative clinician James W. Lane, Ph.D., completed a "Psychiatric Review Technique" evaluation based on plaintiff's medical records.  Dr. Lane based his assessment on plaintiff

_____

[13]A skin eruption; the appearance on otherwise normal skin of nonpigmented white patches of varied sizes.  Stedman's Medical Dictionary, 1726 (25th ed. 1990).

experiencing both affective (major depressive disorder with psychotic features) and substance addiction disorders (marijuana use likely contributing to psychotic symptoms).  Dr. Lane found plaintiff was moderately restricted in her activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace, and had no episodes of decompensation.  (Tr. 186-96.)

Dr. Lane also completed a "Mental Residual Functional Capacity Assessment."  He found plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain punctuality and attendance as generally accepted, work in coordination or proximity with others without being distracted, complete a normal workday and workweek without interruption from psychological symptoms, perform at a consistent pace without an unreasonable number or length of rest periods, interact appropriately with the public, get along with co-workers or peers without distracting them, maintain socially appropriate behavior and to adhere to basis standards of neatness and cleanliness, and set realistic goals or make plans independently of others.  Dr. Lane determined plaintiff suffered no significant limitation in her ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in work setting, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation.  (Tr. 203-04.)

Dr. Lane noted that plaintiff's clinical evaluations were generally credible. However, credibility was lessened by the failure of providers to account for plaintiff's significant use of marijuana.  Moreover, Dr. Lane found that evaluation of plaintiff's functional restrictions was far less credible.  He found that plaintiff had depression with psychosis and marijuana abuse that together magnify her symptoms.  He opined plaintiff should avoid close public and team work and complex

written steps and procedures. Dr. Lane found "[n]o evidence [plaintiff] cannot do at least simple work"; however, she must stop using marijuana and be consistent with her psychiatric medications and supportive therapy. (Tr. 202, 205-06.)

On August 22, 2002, plaintiff was seen at Comprehensive complaining of back pain and headaches. Plaintiff reported some relief when taking "Doan's" back pills,[14] and that the pain is worse when she is in the supine position. With respect to her headaches, plaintiff reported at least one headache per day, with occasional loss of focal vision preceding headache onset. Plaintiff was prescribed medication at this visit, however, the name of the medication is illegible. (Tr. 360-61.)[15]

On November 25, 2002, plaintiff was seen at Comprehensive for complaints of pain in her ribs. Plaintiff was prescribed five days of Fioricet.[16] On January 2, 2003, plaintiff was seen at Comprehensive for sharp pain in her back and headaches. Plaintiff reported that she has tried several medications to relieve the pain and, while she did experience relief, the pain never completely ended. Physical examination was essentially normal, except for tenderness of the back on palpation. Plaintiff was prescribed Ultram[17] and a CAT scan of the head. (Tr. 362-64.)

---

[14]An analgesic non-prescription medication for the "[t]reatment of pains in the back, stiff or aching muscles, pains around the joints, lumbago and similar discomforts." See http://home.intekom.com/pharm/menthola/doans.html (last visited August 2, 2005).

[15]The record contains multiple medical records from Comprehensive. It is not necessary, however, for the undersigned to summarize all record entries as some are not relevant to the issues at hand. See Tr. 360-70.

[16]Fioricet is prescribed, inter alia, to relieve tension headaches. Medline Plus http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601009.html#why (last visited August 1, 2005).

[17]"Ultram is indicated for the management of moderate to moderately severe pain." PDR at 2399.

On January 3, 2003, plaintiff underwent a radiological examination of her dorsal and lumbar spine. The examination was essentially normal, revealing only minimal lumbar scoliosis.[18] (Tr. 371.)

On January 8, 2003, plaintiff was seen at Comprehensive for her annual examination. The examiner noted plaintiff had "many somatic complaints" making reference to plaintiff's January 2 visit. Plaintiff was seen approximately one week later for follow-up regarding her back pain. At that visit, plaintiff reported no change or improvement, and physical examination revealed no changes from January 2. (Tr. 364-66.)

On January 13, 2003, plaintiff underwent a CAT scan of the head, which was essentially normal. On January 23, 2003, plaintiff had a bone scintegraphy (whole body). The results were essentially normal, with the exception of facet osteoarthritis[19] at the L5-S1 intervertebrate level. (Tr. 372-73.)

On March 28, 2003, plaintiff was seen at Comprehensive for stomach pain due to taking 25 Ultram pills with alcohol in an apparent suicide attempt on March 15. Examination was essentially normal and it was noted that plaintiff made an appointment to be seen at the Hopewell Center. (Tr. 366-67.)

On April 21, 2003, plaintiff was evaluated for an "Individual Treatment and Rehabilitation Plan." Her relevant diagnosis at this time was major depression, recurrent, with psychotic features, and a GAF of 40. The record appears to contain a narrative assessment of this visit; however, the quality of the photocopy is poor and otherwise illegible. (Tr. 352-55.)

---

[18]Scoliosis is a "lateral curvature of the spine . . . ." Stedman's Medical Dictionary, 1394 (25th ed. 1990).

[19]Osteoarthritis is a "degenerative or hypertrophic arthritis; degenerative joint disease; arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result . . . ." Id. at 1107.

On July 7, 2003, plaintiff was seen after being bitten by a brown recluse spider.  Plaintiff was prescribed Augmentin,[20] and it was noted that she continued to take Paxil and, as needed, Ultram.  She received further treatment due to the spider bite on August 12, 2003.  (Tr. 367-70.)

On August 19, 2003, plaintiff was again seen for follow-up at the Hopewell Center.  The record appears to indicate that plaintiff failed to attend previous appointments and was non-compliant with her medications.  Plaintiff was oriented to time, person, and place.  The record otherwise is illegible.  Plaintiff was continued on Paxil and Risperdal.  (Tr. 356, 358.)

On November 11, 2003, plaintiff underwent a psychological evaluation, at SSA's request, by L. Lynn Mades, Ph.D.  Plaintiff complained of hearing voices, depression, back pain, and severe headaches.  She reported feeling depressed approximately three days per week for entire days at a time.  Dr. Mades noted that plaintiff reported difficulties interacting with her family and that her mother has a history of psychiatric problems.  Plaintiff further reported receiving mental health treatment at Hopewell Center; however, Dr. Mades noted that treatment records do not reveal that plaintiff received mental health treatment from August 2002 until August 2003.  Plaintiff reported drinking alcohol a week prior to evaluation, and smoking three marijuana cigarettes two times per week.  Plaintiff further reported a history of back pain and taking Paxil, Risperdal, Flexeril, Tramadol,[21] iron, and Ibuprofen.  Dr. Mades noted that plaintiff provided her medication list from memory and did not proffer the actual medication bottles; therefore, Dr. Mades could not determine if she was compliant with her medications.  (Tr. 374-75.)

Plaintiff appeared at the examination with normal hygiene and well-groomed appearance.  She was cooperative and pleasant, and was alert, maintained good eye contact, had normal gait and no perceived deficits

---

[20]"Augmentin is indicated in the treatment of infections . . . ." PDR at 3069.

[21]Tramadol is the pharmaceutical name for Ultram.  See supra, note 17.

in motor functioning. Plaintiff appeared spontaneous, coherent, relevant and logical, and exhibited no problems with receptive or expressive language abilities and rate and rhythm of speech. Plaintiff's speech was not tangential, and she did not exhibit flight of ideas or perseveration. Plaintiff's mood was euthymic, her affect was full and appropriate, and she exhibited no mood disturbances. (Tr. 375-76.)

Plaintiff showed no preoccupations, thought disturbances, or perceptual distortions. She did not exhibit or report delusions. Plaintiff also denied auditory or visual hallucinations. She appeared to be dealing in reality, with logical and sequential thought and no evidence of thought disturbance. Plaintiff denied any current suicidal or homicidal ideas. Plaintiff was oriented to time, place, and person. She was able to complete memory tasks and calculations (with minimal errors). However, she scored poor to fair in proverb interpretation. Overall, plaintiff exhibited fair insight and judgment. (Tr. 376-77.)

With respect to plaintiff's activities of daily living, she reported engaging in household chores and cooking. Plaintiff is able to drive and enjoys watching television and listening to the radio. She reported no problems with social functioning or taking care of her personal needs and hygiene. Plaintiff was able to maintain adequate attention, concentration, persistence, and pace during the evaluation. (Tr. 377-78.)

Dr. Mades diagnosed:

Axis I:          Depressive disorder NOS
                 Cannabis Abuse

Axis II:         Deferred

Axis III:        Back pain, headaches, status post
hysterectomy per claimant

Axis IV:         Moderate. Psychosocial and environmental
problems: Family problems, history of abusive relationships

Axis V:          GAF=70[22]

_____

[22]"Some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally

-14-

(Tr. 378.) Dr. Mades noted that plaintiff reported depression; however, her marijuana use and pain medication may have contributed to her mood problems. Dr. Mades found no evidence of disturbance of thought during examination, and noted only minimal psychological impairment by history and presentation. Plaintiff's prognosis was assessed as fair to good with treatment compliance and ending substance abuse, but guarded without treatment or with continued substance use. Dr. Mades did not believe plaintiff could adequately manage her funds given her substance abuse. (Tr. 378.)

Dr. Mades completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)." Dr. Mades found plaintiff was not limited in her ability to understand, remember, and carry out instructions. Plaintiff was slightly limited in her ability to interact appropriately with the public, supervisors and co-workers, and to respond appropriately to work pressures in a usual work setting. Plaintiff had no limitations with respect to responding to changes in a routine work setting. Dr. Mades opined that plaintiff's marijuana and pain medication use likely contribute to any limitations. (Tr. 379-80.)

Also on November 11, 2003, plaintiff underwent an internal medicine evaluation by Dr. Sale. Plaintiff complained of severe back pain, severe headaches, a history of uterine cancer, hearing voices, and depression. Plaintiff stated that she has scoliosis but undergoes no treatment. She reported sleeping on the floor, due to the pain, and difficulty lifting ten pounds. Plaintiff said she does only light housework, minimal cooking, and cannot go to the grocery store. Plaintiff reported never going to a chiropractor or participating in physical therapy, and that she takes non-steroidal medications and muscle relaxers with minimal pain relief. Plaintiff reported smoking one-half to one pack of cigarettes per day, having an occasional beer, smoking marijuana two times a week for her back pain, and using cocaine on one occasion. (Tr. 381-82.)

Physical examination revealed plaintiff often shifted positions after sitting for a period of time and that she had normal hearing and

functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

speech.  Examination of the head, eyes, ears, nose, throat, neck, lungs, heart, and abdomen were essentially normal.  Plaintiff had back tenderness from the mid lumbar area, scoliosis in the lower thoracic area, and mild paravertebral muscle spasm.  Plaintiff exhibited a normal gait, the ability to squat to 50%, and normal fine finger control; however, she had difficulty walking on her heels and toes.  Her neurological examination was essentially normal, with hand grip strength at 5/5 and muscle strength at 4/5.  Plaintiff's range of motion values were essentially normal.  (Tr. 382-83, 388-89.)

Dr. Sale diagnosed plaintiff with:

1.   Scoliosis with severe pain, perhaps also sprain or strain on a chronic basis.

2.   History of endometrial cancer, treated surgically.

3.   Mental problems evaluated by psychologist.

4.   Headaches, in all likelihood due to tension.

(Tr. 383.)

Dr. Sale completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)."  He determined plaintiff could frequently lift less than ten pounds, could stand or walk at least two hours in an eight-hour work day, could sit less than about six hours in an eight-hour workday, and was limited in pushing and pulling in her upper extremities.  Dr. Sale stated that his conclusions were supported by constant back pain and scoliosis.  (Tr. 384-85.)

Dr. Sale found plaintiff could occasionally climb stairs and balance, and she could frequently kneel, crouch, crawl, and stoop. Plaintiff was unlimited in her ability to reach in all directions, but was limited to occasionally handling, fingering, and feeling.  While Dr. Sale found plaintiff was unlimited in her ability to reach in all directions, he noted she could only engage in reaching occasionally, even though the assessment form clearly indicated that a frequency of activity was to be established only upon a finding that plaintiff was limited in the activity.  Dr. Sale supported these conclusions by stating plaintiff experiences numbness and tingling in her hands.  He further determined that plaintiff was unlimited in her ability to see,

hear, speak, withstand temperature extremes, and deal with noise, vibrations, humidity, and wetness. Plaintiff was limited in her ability to be in an environment with dust, hazards (such as machinery and heights), and fumes due to sinus problems, nausea from odors, and phobia related to heights. (Tr. 385-87.)

On February 3, 2004, plaintiff underwent a radiological examination of the lumbar spine, which was normal. Also on February 3, plaintiff was examined by orthopedic surgeon Jack C. Tippett, M.D., at SSA's request. Plaintiff again complained of low back pain, numbness in hands, headaches, and depression. Physical examination revealed plaintiff was cooperative, friendly, walked without a limp, was able to stand on her heels and toes, could squat and return to a standing position, bend at the waist, dress and undress herself, and get on and off the examination table without assistance. (Tr. 390-91.)

Examination of the neck was essentially normal, with no difficulties in range of motion or associated pain. Plaintiff had good strength and normal range of motion in both upper and lower extremities. Neurological examination revealed plaintiff was orientated to person, time, and place, with symmetrical reflexes and no sensory changes. Examination of her back revealed a slight prominence of the right thorax, extensive scarring, and the ability to tilt ten degrees to the left and right. Range of motion values were essentially normal, with the noted exception of the ten-degree tilting of her back. (Tr. 391, 397-98.)

Dr. Tippett completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)." He found plaintiff was not limited in her ability to lift, carry, stand, walk, sit, push, or pull. Plaintiff was able to climb, balance, kneel, crouch, crawl, and stoop frequently. She was unlimited with respect to her abilities in reaching, handling, fingering, feeling, seeing, hearing, and speaking. Plaintiff was not limited in her ability to be subjected to environments with temperature extremes, noise, dust, vibration, humidity, wetness, hazards (such as machinery and heights), and fumes. (Tr. 393-96.)

**B. Plaintiff's Hearing Testimony**

The ALJ conducted a hearing on August 28, 2003, at which plaintiff was represented by counsel. Plaintiff testified that she lives in a house with her mother and stepfather. Plaintiff has one daughter who lives independently. Plaintiff completed the twelfth grade and became a Certified Nurse's Assistant. (Tr. 33-37, 52.)

Plaintiff last worked for a temporary service stocking shelves in August 2002. She testified she left this position because the work ended. Her work history also includes doing inventory for a pharmacy, working in several nursing homes, and working at McDonald's in 1979 or 1980. Plaintiff testified she is unable to work due to shooting pain in her back, headaches, arthritis, and numbness in her hands, which she has had for approximately the past three years. Plaintiff testified that the numbness in her hands occurs about once a week lasting for approximately one day. (Tr. 37-40, 62.)

With respect to her activities of daily living, plaintiff testified that she wakes up at approximately 9:00 a.m. every morning, going to bed at approximately 12:00 a.m. nightly. She tends to her personal hygiene every morning. She often runs errands with her mother, such as shopping, doctor appointments, or going to restaurants. Plaintiff testified she enjoys working puzzles for recreation. She washes dishes, does laundry, and makes her bed. Plaintiff recently traveled to Ohio for a month with a friend. Plaintiff's mother gave her a back support (similar to a corset), which she wears mostly while sleeping. Plaintiff testified that her daughter and two grandchildren, ages five and nine months, come to her house for visits. Plaintiff watches television and attends church. (Tr. 45-47, 49-51, 59-60.)

Regarding medical treatment, plaintiff testified she primarily receives care from Comprehensive and Hopewell Center. Plaintiff obtains medications and medical care at the Adult Medicine Clinic at Comprehensive. Plaintiff testified she sees a doctor at Hopewell approximately once a month. (Tr. 41-43.)

Plaintiff testified that the brown recluse spider bite caused her intermittent painful, itchy bumps on her legs that will swell and fill with pus. Plaintiff testified this condition does not respond to treatment. Plaintiff further testified that she has an ulcer causing

her stomach pains, and she uses "the bathroom like four or five times a day." Plaintiff testified that her medications worsen this condition. Plaintiff has a history of uterine cancer and had a hysterectomy. (Tr. 47-49, 51-52.)

Plaintiff testified that she suffered burns while playing with matches when she was five years old. Plaintiff underwent skin grafting and has scarring on 45 percent of her body. Plaintiff has difficulty raising her arms above her head because of these burns. Her back pain is due to her burns, automobile accidents, and scoliosis. Her back pain is a sharp pain that at times prevents her from standing and walking long distances. Plaintiff further testified that she has pain in her hips, and experiences cramps in her legs, thighs, feet and toes for approximately 20 minutes, about four times per week. She can walk one block without having to stop, stand for one hour, and carry ten pounds. Plaintiff testified she has difficulty climbing stairs due to pain. (Tr. 52-54, 58-59.)

Plaintiff testified she is under the care of a psychiatrist at the Hopewell Center for depression. She attempted suicide in March 2003 and occasionally has suicidal thoughts, but has not made any other attempts. Plaintiff further testified that she hears voices two to three times per week and she believes the voice is "the devil." The voices tell her to commit suicide so she will not be depressed. Plaintiff testified that she is afraid of everybody; however, she was not afraid of anyone in attendance at the hearing. Plaintiff testified that she has difficulty with her memory, often forgetting actions she intends to take. (Tr. 54-56; 60.)

With respect to medications, plaintiff testified she takes Premarin, Paxil, Tramadol, Ranitidine,[23] iron pills, Vitamin B12, and Risperdal. Plaintiff testified she suffers side-effects from these medications including: migraine headaches, dizziness, and lightheadedness. (Tr. 41-42.)

---

[23]Ranitidine (trade name Zantac) is indicated for the treatment of ulcers, gastroesophageal reflux disease (GERD), and esophagitis. PDR at 1496.

Plaintiff testified regarding a history of substance abuse, including cocaine and marijuana; however, plaintiff testified she has not used cocaine in three or four years or marijuana for eight months. Plaintiff denied any alcohol use. (Tr. 58-59.)

## C.    Testimony of the Vocational Expert

Vocational Rehabilitation Counselor John Stephen Dolan, M.A., C.R.C., (VE) testified at the hearing. The VE acknowledged plaintiff's past work as a certified nurse's assistant, an inventory clerk, and a price marker, but he was unable to discern from the record if any of plaintiff's previous work experience amounted to substantial, gainful employment. (Tr. 67-68.)

The ALJ presented the VE with the following hypothetical:

Well, if we would assume a hypothetical individual, and this is--I've taken this first part of the hypothetical out of thin air, but--just for a place to start, but say the person could lift 50 pounds occasionally and 25 pounds frequently and a person could stand at least six hours in an eight hour work day and sit at least six hours in an eight hour work day all with normal breaks, and that the person would be limited to work that would not require close interaction with the public or--and close interaction with co-workers in the sense of team work type work or that there has to be interaction--positive interaction between team members. Let's put it that way. Not co-workers in a sense of one next to another doing one job after another and work that would be simple and/or repetitive. With hand--also the-- would have to avoid exposure, generally, to the sun. And based on those restrictions, would there be--let's assume there's no hypothetical--no past relevant work I mean. With those restrictions, would there be jobs that could be performed within the economy?

(Tr. 68.)

The VE identified several jobs at the medium exertional level, in the St. Louis metropolitan area, that a person fitting the description of the hypothetical could do: dining room attendant (4,000 jobs); dishwasher (2,500); stocker (8,700); and cleaners (21,000). (Tr. 68-69.)

The ALJ then asked the VE to consider the same hypothetical, but the claimant could only work at the light exertional level. The VE responded that the relevant employment options would include: cleaners

(5,000); assembly jobs (6,500); and hand packagers (2,000). At the sedentary occupational base, there would be 1,300 assembler jobs, with most sedentary jobs eliminated due to restrictions on close interaction with the public. Altering the hypothetical to exclude the ability to make repetitive, bilateral hand movements would eliminate work as an assembler, stocker, and hand packager. The VE further testified that, if a claimant was absent from work two or more times a month on a consistent basis or was not able to complete the workday once every other week, all competitive employment would be excluded. The inability to raise one's hands above her head with much force would eliminate stocking jobs. Moreover, the need to be free from exposure to certain chemicals would eliminate positions as a cleaner or dishwasher and, depending on the claimant's level of chemical sensitivity, could reduce the number of some other identified positions. (Tr. 69-71, 74.)

Counsel posed a hypothetical to the VE matching the ALJ's original hypothetical, but adding the claimant was moderately impaired in her ability to relate to others, socially interact, understand, remember and follow instructions, and she was significantly impaired in her ability to maintain attention to perform simple repetitive tasks, withstand stress and pressure of daily work activities, and adapt to new and novel situations and cope with stress. The VE testified such a claimant would not be able to maintain competitive employment. Moreover, the VE testified that the fact that a claimant hears voices and attempted suicide in the past would not preclude employment, unless the claimant was becoming confused or disoriented by the voices or acted on the voice's suggestions on a repeated basis. (Tr. 71-73.)

**D. The ALJ's Decision**

In a May 28, 2004, decision denying benefits, the ALJ found that "[t]he medical evidence does not establish any impairment or combination of impairments that meets or equals in severity the requirements of any impairment . . . ." The ALJ assessed plaintiff's eligibility for benefits based on her alleged impairments of degenerative disc disease, childhood burn injuries, intermittent tension headaches, depressive disorder, and a history of alcohol and marijuana use. (Tr. 13-14, 20.)

Upon review of the record, the ALJ found that the medical evidence and other evidence of record were inconsistent with plaintiff's allegations of disability. The ALJ determined that plaintiff had an erratic work record, was previously denied disability benefits, and had no significant restrictions in her activities of daily living. Moreover, plaintiff's history of substance abuse, while not itself forming a basis for disability, did not affect plaintiff such that she would suffer disabling conditions absent substance use, and plaintiff reported ceasing substance use during the relevant evaluation period. (Tr. 15, 18.)

The ALJ noted that plaintiff has scarring from childhood burns; however, she worked for a number of years after suffering this injury. Moreover, plaintiff has had no recurrence of uterine cancer, and she is prescribed hormone replacement therapy to counteract any effects from a previous hysterectomy. The ALJ further found that while plaintiff complains of musculoskeletal pain, examinations have not revealed any consistent severe musculoskeletal problems or functional restrictions. The ALJ noted that Dr. Sale identified several functional restrictions; however, the ALJ discredited this report stating that it was based solely on plaintiff's subjective complaints and not on actual clinical findings. The ALJ further noted that plaintiff did not take any strong pain medication and showed no evidence of side-effects precluding her from taking such medication.[24] (Tr. 15-18.)

With respect to plaintiff's alleged mental health impairments, the ALJ noted that she has been diagnosed with depressive disorder, with at least one examiner additionally finding psychotic features associated with the depression. Despite having depression, the ALJ concluded that the medical records revealed plaintiff did not seek treatment on a regular, sustained basis, and whether she actually took the medications prescribed for treatment was questionable. The ALJ further noted that "the preponderance of the medical evidence does not show the claimant

---

[24] A "friend" (Marlena Jones) also provided evidence of plaintiff's impairments on her behalf. The ALJ did not find the friend's information persuasive, and discredited the observations for the same reasons he discredited plaintiff's allegations. (Tr. 14, 21.)

to have any severe degree of depression, whether she is medication compliant or not, or whether she is actively substance abusive or not." The ALJ found that the mental health records failed to show significant, long-term impairment in plaintiff's abilities to think, understand, concentrate, handle normal work stress or get along with others, as well as deterioration in her hygiene, daily activities, intelligence, contact with reality, speech, mood and affect, memory, attention span, insight, judgment, or behavior. Based on these findings, the ALJ determined plaintiff did not have a combination of mental impairments meeting or equaling a listed impairment. (Tr. 15-20.)

Based on all the aforementioned, the AlJ found plaintiff retained the residual functional capacity (RFC) "to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 25 pounds frequently or more than 50 pounds occasionally; or jobs that would involve sun exposure, close contact with supervisors or co-workers, or more than simple, repetitive tasks." Based on this RFC, the ALJ determined plaintiff could work in the medium, light, or sedentary occupational base, but she would be excluded from working in the full range of occupations in each level of work. (Tr. 17, 21.)

Finding plaintiff did not have any past, relevant work, the ALJ assessed the VE's testimony. Crediting all credible testimony and medical evidence, the ALJ posited a series of hypotheticals to the VE. In response, the VE identified jobs plaintiff could engage in based on the proffered hypotheticals. The ALJ ultimately concluded the identified positions constituted "a significant number of jobs in the local and national economies which the claimant could perform." (Tr. 16-17, 21.)

The Appeals Council declined further review. Hence, the ALJ's decision became the final decision of defendant Commissioner subject to judicial review. (Tr. 6-8.)

In her appeal, plaintiff argues that the ALJ (1) incorrectly found that plaintiff failed to comply with depression medication; (2) failed to accord proper weight to the opinion of plaintiff's treating

physician; and (3) failed to consider hypotheticals to the VE in making his determination.  (Doc. 14.)

## II.  DISCUSSION

### A.  General Legal Framework

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir. 2003).  In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision.  See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003).  So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently.  See Krogmeier, 294 F.3d at 1022.

To be entitled to benefits on account of disability, a claimant must prove that she is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004).  A five-step regulatory framework governs the evaluation of disability in general.  See 20 C.F.R. §§ 404.1520, 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached.  20 C.F.R. § 404.1520(a)(4).

### B.  Plaintiff's Medication Compliance

Plaintiff argues that the ALJ's finding that plaintiff was non-compliant with depression medication was not based on substantial

evidence and, therefore, he erred in determining that a possible reason for her uncontrolled mental health problems was medication non-compliance. The undersigned disagrees.

In determining whether substantial evidence supports the ALJ's determination, the court must scrutinize evidence that fairly supports, or detracts from, the ALJ's decision. See Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998).

In this case, plaintiff's argument seemingly suggest that the ALJ found plaintiff had severe mental impairments that were controllable with medication, but that plaintiff was non-compliant with her medication. In pertinent part, the ALJ noted:

> Even if the undersigned were inclined to find the claimant's mental impairments to be so severe so frequently as to effectively prevent her from working at a regular job (he is making no such finding), the claimant would not be found entitled to disability benefits in this case for one of two reasons, or possibly both. This is because the severity of [her] mental impairments would be directly attributable to either ongoing substance abuse, or noncompliance with prescribed medication.

(Tr. 18.)

The undersigned believes plaintiff's characterization misstates the ALJ's analysis. This portion of the ALJ's opinion is not reflective of the ALJ's findings, but more of a hypothetical, alternative statement that, if plaintiff had severe mental health impairments precluding work, she would not be deemed disabled under SSA regulations because her symptoms could be controlled if she regularly took her prescription medication. Whether this determination is based on substantial evidence is not ultimately relevant on review, because the ALJ never made a finding that plaintiff suffered from severe mental impairments preventing her from engaging in substantial employment. However, the ALJ did find that plaintiff's subjective complaints were incredible, based in part on his assessment that she was non-compliant with prescription medication. To this end, the undersigned reviews the ALJ's credibility assessment as it relates to plaintiff's medication compliance.

Assessing a claimant's credibility is primarily the ALJ's function. See Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001); Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003). In Singh v. Apfel, the Eighth Circuit held that an ALJ who rejects subjective complaints (of pain) must make an express credibility determination explaining the reasons for discrediting the complaints. 222 F.3d 448, 452 (8th Cir. 2000).

The Eighth Circuit held in Polaski v. Heckler that an ALJ cannot reject subjective complaints of pain based solely on the lack of medical support, but instead must consider various factors. 739 F.2d 1320, 1322 (8th Cir. 1984). The factors include, in part, observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. Id.

"[A] failure to follow prescribed medical treatment without good cause is a basis for denying benefits." Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). "It is for the ALJ in the first instance to determine a claimant's real motivation for failing to follow prescribed treatment or seek medical attention." Hutsell v. Sullivan, 892 F.2d 747, 751 n.2 (8th Cir. 1989).

In the case at bar, there are instances in the record where providers either question plaintiff's compliance, or note that she has a history of partial compliance. Moreover, the record clearly shows that plaintiff was given a two month prescription for Risperdal and Paxil on April 29, 2002, and there is no record of an additional prescription until August 9, 2003. During this same period, there is no record plaintiff received any psychiatric treatment or counseling at either Hopewell Center or any other provider. See Holley, 253 F.3d at 1092; Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987) ("The ALJ was certainly entitled to find [claimant's] failure to seek medical attention inconsistent with her complaints of pain.").

It is plaintiff's burden to provide information evidencing her alleged impairments and the landscape of her relevant medical history. See 20 C.F.R. § 404.1512(c) ("Your responsibility. . . . You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your case."). There is no indication in the record of how plaintiff maintained compliance with prescribed treatment during the period where she was not actively receiving mental health treatment and appears to have no valid prescription refills. See Kelley, 372 F.3d at 961 ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints."); cf. Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) ("The ALJ may properly consider both the claimant's willingness to submit to treatment and the type of medication prescribed in order to determine the sincerity of the claimant's allegations of pain.") (citations omitted).

Accordingly, to the extent the ALJ referred to plaintiff's lack of compliance with treatment as evidence detracting from her credibility, the undersigned finds he did not err.

## C.   **Weight Afforded Opinions of Treating Providers**

Plaintiff argues that the ALJ failed to give controlling weight to the medical opinions of treating providers at Hopewell Center or, alternatively, failed to provide sufficient reasons for discounting the treating provider opinions. Specifically, plaintiff refers to the fact that the ALJ did not reference Dr. Cowan or plaintiff's GAF scores in his opinion.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh, 222 F.3d at 452. If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion should be given controlling weight. Id. However, "statements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'" Cruze v. Chater, 85 F.3d 1320,

1325 (8th Cir. 1996) (quoting <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1316 (8th Cir. 1991)). A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight. <u>See id.</u>; <u>Sampson v. Apfel</u>, 165 F.3d 616, 618 (8th Cir. 1999). An ALJ should "give good reasons" for discounting a treating physician's opinion. <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878-79 (8th Cir. 2002).

In its "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," SSA stated that its reference to the GAF is not "to endorse its use in the Social Security and SSI disability programs," further noting that "[t]he GAF scale, which is described in the DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746-01, at 50764-65 2000 (August 21, 2000) (codified at 20 C.F.R. part 416); <u>cf.</u> <u>Howard v. Comm'r of Social Security</u>, 276 F.3d 235, 241 (6th Cir. 2002) (GAF score "is not essential to the RFC's accuracy").

Accordingly, per SSA regulations, plaintiff's GAF, while it can be evaluated as a part of the entire medical record, does not of itself reflect plaintiff's ability to engage in substantial, gainful employment. While a GAF of 40 or 50 suggests severe impairments, by definition a plaintiff is not required to manifest impairment in employment in order to receive a GAF in this range. Moreover, even if the ALJ was to place as much emphasis on plaintiff's GAF scores as she desires, the record reflects plaintiff was assessed a GAF of 40 or 50 when she was receiving little or no treatment for a period of time and when her medication compliance was questioned, and that plaintiff also was assigned a GAF of 60 and 70 in other examinations.

Therefore, the ALJ did not err in failing to give more weight to plaintiff's GAF scores.

Moreover, while the ALJ did not specifically reference Dr. Cowan by name, he did advert to treatment records from Hopewell Center. <u>See</u>

Black, 143 F.3d at 386 ("[A]n ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered . . . .") (internal citations omitted); cf. McGinnis v. Chater, 74 F.3d 873, 875 (8th Cir. 1996) (asserted errors in opinion-writing do not require a reversal if the error has no effect on the outcome).

In referring to these records, the ALJ noted that plaintiff only saw her alleged "treating" providers on a few occasions. A review of the record reveals plaintiff obtained an initial, non-physician evaluation on April 2, 2002; underwent an initial psychiatric evaluation by Dr. Cowan on April 29, 2002; and underwent an annual updated evaluation in April 2003 by Dr. Cowan. These visits form the main component of plaintiff's treatment history at Hopewell Center. Moreover, there is no indication from the records that Dr. Cowan evaluated plaintiff's ability to work or completed any RFC or similar work-related ability form. See 20 C.F.R. § 416.927(d)(2)(I) ("Generally, the longer a treating source has treated . . . , the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."); see also Randolph v. Barnhart, 386 F.3d 835, 839-40 (8th Cir. 2004) (finding the ALJ did not err in discrediting the opinion of a treating physician who only saw plaintiff three times prior to evaluating her ability to engage in employment, where treatment notes did not indicate the treating provider discussed with plaintiff her prior work experiences or ability to be employed, and the treating physician never treated plaintiff during a time when she was employed).

Accordingly, to the extent plaintiff argues that Hopewell Center records were completely discounted and not afforded appropriate weight, the undersigned disagrees, finding the ALJ did not err.

D.    The ALJ's RFC Determination and Hypothetical to the V.E.

A hypothetical question to a VE must precisely describe a claimant's impairments so that the VE may accurately assess whether jobs

exist for the claimant.  <u>Newton v. Chater</u>, 92 F.3d 688, 694-95 (8th Cir. 1996) ("A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant."); <u>see</u> <u>Pierce v. Apfel</u>, 173 F.3d 704, 707 (8th Cir. 1999) (a proper hypothetical presents to the VE a set of limitations that mirror those of the claimant); <u>Totz v. Sullivan</u>, 961 F.2d 727, 730 (8th Cir. 1992).  It "must capture the concrete consequences of claimant's deficiencies." <u>Pickney v. Chater</u>, 96 F.3d 294, 297 (8th Cir. 1996).

Essentially, plaintiff does not challenge the substance of the hypotheticals posited to the VE, but argues that the ALJ, in making his RFC determination, failed to consider the VE's response to the hypothetical that most closely mirrored plaintiff's impairments.

An RFC determination is a medical issue, <u>Singh</u>, 222 F.3d at 451, which requires consideration of supporting evidence from a medical professional. <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001). The ALJ is required to determine plaintiff's RFC based on all the relevant evidence. <u>See</u> <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); 20 C.F.R. §§ 404.1546, 416.946 (2001). The ALJ is only required to consider plaintiff's credible impairments supported by the record in determining her RFC. <u>See</u> <u>Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record . . . ."); <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 446 (8th Cir. 2004).

Because the ALJ needs to include only the credible impairments in hypotheticals to the VE, it is necessary to review the ALJ's credibility determination. The ALJ found plaintiff's subjective symptoms were not fully credible.  It is not within the undersigned's purview to redetermine plaintiff's credibility.  As long as there is substantial evidence in the record, the ALJ's decision will be upheld even if substantial evidence exists adverse to the ALJ's findings.  <u>See</u> <u>Kroqmeier</u>, 294 F.3d at 1022; <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990) ("ALJs must seriously consider a claimant's testimony about pain, even when . . . subjective.  But questions of credibility are for the trier of fact in the first instance.  If an ALJ explicitly

discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment."); cf. Orrick v. Sullivan, 966 F.2d 368, 372 (8th Cir. 1992) (quoting Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992) (quoting Benskin, 830 F.2d at 883 ("No one, including the ALJ, disputes that plaintiff has pain . . . . The question is 'whether she is fully credible when she claims that her back hurts so much that it prevents her from engaging in her prior work.'"))).

As previously discussed, record evidence indicates non-compliance with medications and that plaintiff received treatment infrequently. These are all valid considerations when assessing credibility. See Kelley, 372 F.3d at 961; Holley, 253 F.3d at 1092. Moreover, regarding plaintiff's burns, the fact that she engaged in employment for 23 years after suffering this serious injury does little to buttress any complaints she may have of currently being unable to engage in gainful employment based on this injury.

The ALJ further noted plaintiff's "scattered and somewhat erratic work record . . . ." (Tr. 15.) A review of the record reveals that plaintiff has earned consistently low wages well before her application for benefits. A poor work history can lessen a claimant's credibility. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993); See King v. Apfel, 991 F. Supp. 1101, 1108 (E.D. Mo. 1997). Moreover, the ALJ found plaintiff's demeanor at the hearing was inconsistent with alleged physical and mental impairments. This is a proper factor to consider when assessing credibility. See Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) (in making credibility determination, ALJ may properly consider personal observations of claimant's demeanor during hearing).

With respect to her activities of daily living, while plaintiff reports severe pain, hearing voices, depression, and anxiety, her hearing testimony indicates that she is able to tend to personal hygiene, regularly run errands with her mother, attend church services, engage in household chores, visit with her grandchildren, and travel long distances. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain

where claimant was able to care for one of his children on daily basis, drive car infrequently, and go grocery shopping occasionally); Woolf, 3 F.3d at 1213 (plaintiff lived alone, drove, shopped for groceries and did housework with some help from neighbor).

Lastly, the ALJ found plaintiff's subjective complaints were not consistent with objective medical evidence. The ALJ noted that plaintiff was diagnosed physically with little more than muscle strain, that she has had no recurrence of cancer, that she is treated for menopausal symptoms, that there have been no significant physical problems noted on examination, that there have been no significant neurological problems noted on examination, and that all radiological examinations, for the most part, have been normal. With respect to mental health treatment, plaintiff has not undergone regular mental health treatment, the records do not reflect an ongoing, significant counseling or treatment relationship, and plaintiff's diagnoses have largely been based on self-reporting and limited examination, with little or no psychological testing.

Dr. Sale examined plaintiff twice, both times at SSA's request, approximately 18 months apart. Dr. Sale's examinations revealed no significant abnormalities or physical impairments beyond tension headaches, back strain, and scoliosis (which is untreated). Dr. Tippett examined plaintiff and found no significant physical impairments or abnormalities. Similarly, plaintiff's treating physicians at Comprehensive have failed to note any significant physical problems on an ongoing basis.

Regarding plaintiff's mental health complaints, she reported hearing voices telling her to commit suicide and depression. Plaintiff has had several independent mental health examinations. All providers have determined that plaintiff suffers from depression, with some providers noting psychotic features. During examination, plaintiff has exhibited relevant and coherent thought processes, fair memory skills, fair to some impairment in concentration, persistence and pace, and occasional flat affect and depressed mood. Plaintiff has shown consistent orientation to time, person, and place. Moreover, while stating she has suicidal thoughts due to the "voices in her head,"

plaintiff has denied any suicide attempt, suicide plan, or desire to take her own life since the sole incident in March 2003. Plaintiff also continued to use marijuana (a depressant) during the time of evaluation.

Reviewing the record *in toto*, the undersigned concludes the ALJ did not err in concluding plaintiff's subjective complaints of pain and mental health limitations were not fully credible or as limiting as she advances. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence.").

Moreover, the undersigned further concludes that the ALJ did not err in making his RFC determination. As previously noted, "'[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999) (quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)); see also Cox v. Barnhart, 345 F.3d 606, 610 (8th Cir. 2003)). "In addition, the ALJ need not give controlling weight to a physician's RFC assessment that is inconsistent with other substantial evidence in the record." Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004); see also Holmstrom, 270 F.3d at 721.

Dr. Sale found that plaintiff could frequently lift ten pounds, stand or walk at least two hours in an eight-hour day, and could sit less than six hours in an eight-hour day. Further, he determined that plaintiff was limited in her ability to climb stairs, balance, and handle, finger and feel objects. Dr. Sale also noted that plaintiff was unlimited in her reaching ability; however, he then noted she could only reach "occasionally." See Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies."). Dr. Sale determined plaintiff was also limited in her ability to be in an environment with dust, hazards, and fumes.

Dr. Sale's RFC evaluation differs from that of Dr. Tippett, an orthopedic specialist. Dr. Tippett found that plaintiff was unlimited

in all facets with regard to her ability to engage in work-related activities.  Under SSA regulations, the ALJ was entitled to accord more weight to Dr. Tippett's opinion as an examining orthopedic surgeon, than to Dr. Sale's opinion as an examining internal medicine physician.  <u>See</u> 20 C.F.R. § 416.927(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); <u>see also</u> <u>Singh</u>, 222 F.3d at 452 ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); <u>Kelley</u>, 133 F.3d at 589.

With respect to plaintiff's mental health RFC, consulting examiner Dr. Reid found that plaintiff was moderately impaired in her ability to relate to others, interact socially, and understand, remember and follow instructions.  Dr. Reid found plaintiff was significantly impaired in her ability to maintain attention required to perform simple tasks, withstand stress and pressure associated with daily work activity, and ability to adapt to new situations and cope with stresses and strains of modern life.

In contrast, consulting examiner Dr. Mades found that plaintiff was not impaired in her ability to understand, remember, and carry out instructions.  Dr. Mades found plaintiff was only slightly limited in her ability to interact with the public, interact appropriately with supervisors and co-workers and respond appropriately to work pressures and settings.

Dr. Mades's opinion is supported by that of non-examining, consulting provider Dr. Lane.  Dr. Lane opined that plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain punctuality and attendance as generally accepted, work in coordination or proximity with others without being distracted, complete a normal workday and workweek without interruption from psychological symptoms, perform at a consistent pace without an unreasonable number or length of rest periods, interact appropriately with the public, get

along with co-workers or peers without distracting them, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independently of others.  Dr. Lane further determined that plaintiff suffered no significant limitation in any other respect.

There is nothing in the record or SSA regulations requiring the ALJ to accord more weight to Dr. Reid's opinion than Dr. Mades's.  And, as aforementioned, Dr. Mades's opinion is supported by that of Dr. Lane, which, even though it was not based on examination, is still entitled to be considered in relation to all other record evidence.  Cf. Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) ("The opinions of these treating sources should have been afforded greater weight than those of the nontreating, non[-]examining consultants.").

Viewing the totality of the medical evidence, the ALJ's RFC assessment is supported by substantial evidence of record.  See Krogmeier, 294 F.3d at 1022 (if substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently); Woolf, 3 F.3d at 1213.

Accordingly, the ALJ did not err in giving the VE the hypothetical questions that contained impairments that the ALJ found were sufficiently credible and supported by substantial evidence of record.

## RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


DAVID D. NOCE
UNITED STATES MAGISTRATE JUDGE


Signed on August 25, 2005.